UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br>   v.<br><br>KYLE CHRISTOPHER BENTON,<br><br>        Defendant. | CASE NO. 2:24-cr-00162-TL<br><br>ORDER ON MOTION FOR REVIEW AND REVOCATION OF DETENTION ORDER |

Defendant Kyle Christopher Benton is indicted on one count of Unlawful Possession of a Machinegun and one count of Possession of an Unregistered Firearm. This matter is before the Court on Mr. Benton's Motion for Review and Revocation of Detention Order (Dkt. No. 19), appealing the September 10, 2024, detention order (Dkt. No. 10). Having reviewed the Government's response (Dkt. No. 24), Mr. Benton's reply (Dkt. No. 25), and the relevant record, and finding oral argument unnecessary, *see* CrR 12(b)(12), the Court DENIES the motion.

## I. BACKGROUND

On September 19, 2024, a grand jury indicted Mr. Benton on one count of Unlawful Possession of a Machinegun, 18 U.S.C. § 922(o), and one count of Possession of an Unregistered Firearm, 26 U.S.C. §§ 5861(d), 5845(a)(3). Dkt. No. 11. Upon the execution of a search warrant at Mr. Benton's home, law enforcement recovered a black M16-type rifle, which function tested as a machinegun, as well as two other short-barreled rifles, at least one of which was unregistered. *See* Dkt. No. 24 at 7; Dkt. No. 11 at 1–2.

The Government filed a motion for detention, arguing that Mr. Benton should be detained to ensure both his appearance as required and the safety of any other person and the community.[1] *See* Dkt. No. 6 at 2. Pretrial Services filed an initial report recommending that Mr. Benton be detained. *See* Dkt. No. 7 (sealed) at 2–3. In a second report, they recommended that Mr. Benton be released with conditions. *See* Dkt. No. 8 (sealed) at 4–5. On September 10, 2024, the magistrate judge conducted a detention hearing and ordered that Mr. Benton be detained on the basis of safety only. *See* Dkt. No. 10 at 2; *see also* Dkt. No. 13 (order continuing detention after indictment).

Mr. Benton now appeals the detention order and seeks his release pending trial with conditions. *See* Dkt. No. 19; *see also id.* at 7 (proposed conditions); Dkt. No. 25 (reply). The Government opposes. *See* Dkt. No. 24.

---

[1] At the detention hearing, however, the Government appeared to abandon nonappearance as a ground for detention. *See* Dkt. No. 21 (Audiotape: Detention Hearing) at 1:49–2:03 (Government: "We're bringing our motion under the dangerousness prong. . . . I'm not going to focus on risk of flight. I don't think that the record is particularly concerning there."), 32:22–32:28 (Magistrate Judge: "I don't think anyone is arguing that you would be a flight risk, so I won't address that element.").

ORDER ON MOTION FOR REVIEW AND REVOCATION OF DETENTION ORDER - 2

## II. LEGAL STANDARD

### A. Standard of Review

A person who is ordered detained by a magistrate judge "may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). A district court reviews the detention order *de novo*. *United States v. Koenig*, 912 F.2d 1190, 1191–93 (9th Cir. 1990).

### B. Detention Standard

The Bail Reform Act (the "Act"), 18 U.S.C. § 3141, *et seq*., requires that a court release a criminal defendant on personal recognizance or on an unsecured appearance bond before trial, unless there is a determination that such release "will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). This default requirement is in accord with the principle that "[i]n our society, liberty is the norm, and detention prior to trial . . . is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Ninth Circuit cautions that "[o]nly in rare cases should release be denied." *United States v. Santos–Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015) (citing *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985)). Further, "doubts regarding the propriety of release are to be resolved in favor of the defendant." *Id.* If a court determines that such release will not reasonably assure the defendant's appearance and the safety of the community, then the court must impose "the least restrictive further condition, or combination of conditions," that will reasonably assure these goals. 18 U.S.C. § 3142(c)(1)(B). The Act only requires detention where a court finds that no such condition or combination of conditions can do so. 18 U.S.C. § 3142(e)(1).

If the government moves for detention pursuant to 18 U.S.C. § 3142(f), and a defendant is eligible for a detention hearing,[2] then the court must determine whether there are conditions of release that reasonably assure two goals: "the appearance of the defendant as required" and "the safety of any other person and the community." 18 U.S.C. § 3142(g). In making this determination, a court considers the following factors: (1) the nature and circumstances of the offense charged, including whether the offense falls into certain enumerated categories; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. *Id*.

To obtain pretrial detention, the government bears the burden of showing by a preponderance of the evidence that there are no conditions that will reasonably assure the defendant's appearance as required, and by clear and convincing evidence that there are no conditions that will reasonably assure the safety of any other person and the community. *See* 18 U.S.C. § 3142(e)(1); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).

### III.   DISCUSSION

As an initial matter, the magistrate judge concluded that Mr. Benton does not pose a risk of flight and based the detention order only on safety grounds. *See* Dkt. No. 10 at 1–2. Neither Mr. Benton nor the Government seeks to relitigate the issue of nonappearance. *See* Dkt. Nos. 19, 24. Therefore, the Court considers the factors enumerated in 18 U.S.C. § 3142(g) to determine

---

[2] Mr. Benton does not challenge his eligibility for detention. At a minimum, he appears eligible because he is charged with a felony offense involving possession of a firearm. *See* 18 U.S.C. § 3142(f)(1)(E).

ORDER ON MOTION FOR REVIEW AND REVOCATION OF DETENTION ORDER - 4

only whether there are conditions that would reasonably assure the safety of any other person and the community.

A.    **Nature and Circumstances of the Offenses Charged**

Mr. Benton is charged with the unlawful possession of a machinegun and an unregistered firearm—that is, offenses involving a "firearm," which are specifically enumerated by the Act for a court's consideration. *See* Dkt. No. 11; 18 U.S.C. § 3142(g)(1). Law enforcement found multiple firearms in Mr. Benton's home, including the M16-type rifle that functions as a machinegun and two other short-barrel rifles. *See* Dkt. No. 24 at 7. The firearms were found in an unsecured closet, two of the rifles were loaded, and one rifle had a round in the chamber. *See id.* The Government also notes Mr. Benton's "accelerationist views," and that he "recently encouraged others to commit acts of violence." *Id.*; *see infra* Section III.D.

Therefore, the Court finds that the nature and circumstances of the offenses charged weigh in favor of detention.

B.    **Weight of the Evidence**

The Government describes the weight of the evidence as "considerable." Dkt. No. 24 at 8. The firearms at issue were seized pursuant to a presumably valid search warrant issued by a magistrate judge of this District, and they were found in Mr. Benton's home. *See id.* The Government also points out that the firearms visually match images of firearms posted to social media accounts associated with Mr. Benton. *See id.*

Despite all the evidence the Government has and may ultimately bring to bear in this case, Mr. Benton is presumed innocent before trial, and nothing in the Court's analysis may be construed as modifying or limiting that presumption. 18 U.S.C. § 3142(j). Further, the Ninth Circuit has repeatedly declared that the weight of the evidence is the least important factor, and the statute neither requires nor permits a pretrial determination of guilt. *Gebro*, 948 F.2d at 1121;

*see also United States v. Hir*, 517 F.3d 1081, 1090 (9th Cir. 2008); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986); *Motamedi*, 767 F.2d at 1408.

Therefore, while the Court finds that the weight of the evidence weighs in favor of detention, it treats this factor as the least important.

**C.      History and Characteristics of Mr. Benton**

Mr. Benton is 28 years old and was living in Snohomish, Washington, prior to his arrest. Dkt. No. 8 at 2. He lives with his partner and their two children, ages three and one, and they all rely on him for financial support. Dkt. No. 19 at 2. He is a "self-described 'workaholic,'" employed by Orkin, a pest control company. Dkt. No. 19 at 2; Dkt. No. 8 at 2–3. He served in the Army from 2017 to 2020, including a seven-month combat deployment. Dkt. No. 8 at 2. He received an Honorable Discharge with Conditions, which included programs related to mental health issues that had become evident in 2020. Dkt. No. 8 at 4; Dkt. No. 21 at 17:39–18:24. He is considered 80 percent disabled by the United States Department of Veterans Affairs and receives benefits. *Id.* at 2–3. He appears to have a strong community of friends and family, several of whom submitted letters to the Court speaking highly of his character and personal growth, even while knowing of his stated views. *See* Dkt. Nos. 19-1, 19-2, 20 (sealed), 19-3, 20-1 (sealed), 20-3 (sealed) (letters); Dkt. No. 25 at 2. He does not report any current substance abuse. Dkt. No. 8 at 3–4. His criminal history consists solely of a domestic violence allegation (investigated by the Army) that was ultimately dismissed. Dkt. No. 8 at 4.

Mr. Benton also acknowledges that he "suffers from mental health issues that are complicated by childhood and combat-related trauma," and he is participating in therapy through the Wounded Warrior Project. Dkt. No. 19 at 4; *see also* Dkt. No. 20-2 (sealed) (letter from therapist); Dkt. No. 8 at 3 (detailing mental health history). The Court commends Mr. Benton for seeking out and participating in therapy and the efforts he has made. However, these mental

health issues—in combination with Mr. Benton's extremist views and recent activities, *see infra* Section III.D—concern the Court. Still, Mr. Benton's community, employment, and family circumstances are strong and positive.

Therefore, the Court finds that Mr. Benton's history and characteristics weigh narrowly in favor of release.

**D.     Nature and Seriousness of Danger to Any Person or the Community**

In its response, the Government details Mr. Benton's troubling, recent, and extended history of extremist views and activities (Dkt. No. 24 at 2–5):

- An Army investigation of Mr. Benton (which concluded with an arrest in 2019) included an investigation of his social media accounts, which contained "anti-Semitic and neo-Nazi propaganda," as well as "violent extremist content." *Id.* at 2. Mr. Benton "had been communicating with another about the idea of killing a homeless person to see how it would feel." *Id.* He was a member of several extremist groups, including the O9A (Order of Nine Angles), "an occult-based, neo-Nazi, and white supremacist group." *Id.* at 2 & n.1. He actively recruited soldiers to join such groups. *Id.* at 2. He expressed sympathy for Brenton Tarrant, the person who committed a shooting in Christchurch, New Zealand, in 2019, and said he wanted to shoot up "the alphabet boys," a reference to federal law enforcement agencies, or a local police station. *Id.*

- An FBI investigation of social media accounts linked to Mr. Benton uncovered "iconography and ideology in support of accelerationism, a white supremacist belief in violent action to precipitate societal and governmental collapse with an attendant race war." *Id.* The online activity spanned "years." *Id.*

- In 2021, Mr. Benton told a confidential source that he supported the Butler Plan, "which has, at its core, the creation of a white ethno-state in the Pacific Northwest." *Id.* He also told the source that "he viewed himself as a leader and unifier of white supremacists and alt-right groups and that he wanted to recruit more individuals into his group." *Id.*

- In 2022, following the shooting of ten African Americans in Buffalo, New York, Mr. Benton wrote in a private Instagram message, "Today has been another glorious entry into the annals of Aryan Terror," and went on to celebrate the shooting. *Id.* at 2–3.

- Also in 2022, a family member said Mr. Benton "regularly spoke about how Jews and African Americans needed to be killed." *Id.* at 3. The family member also said that Mr. Benton "and his associates trained together in the woods frequently and that another training event was upcoming." *Id.*

- Further investigation revealed that Mr. Benton was associated with Terrorgram, a network of Telegram accounts promoting "neo-fascist" ideology. *Id.* The network has created "manuals on how to carry out acts of racially-motivated violence" and "a documentary extolling the attacks of so-called 'saints,'" a term referring to certain individuals who carry out racially motivated killings. *Id.*

- In August 2024, a social media account associated with Mr. Benton posted about so-called "saints": "Going into random chats and hyping up saints might get some weirdo to become a saint because he knows people will love him." *Id.* The account posted in a forum an image of Dylann Roof, the person who committed the shooting at Emanuel African Methodist Episcopal Church in Charleston, South Carolina, and called him "Saint Roof." *Id.* at 4. The account went on to comment, "I f**king love the saints," and encouraged readers to become "saints." *Id.* A social media account associated with Mr. Benton also posted a video of a person (identified by investigators as Mr. Benton) firing a fully automatic rifle. *Id.*

In his motion, Mr. Benton tries to paint the picture of a changed man. *See* Dkt. No. 19 at 3–7. He states that he "has identified the problems with aligning himself with these hate-filled views and has worked hard to better himself for the sake of his family." Dkt. No. 19 at 6. He says he "has been proactively engaging" over the last year in "positive contact with groups that were the targets of [his] hatred." *Id.* And the Government concedes that Mr. Benton "has not articulated a particular plan" to do any "specific act." Dkt. No. 21 at 12:01–12:28. The Court

does not seek to interrupt or deter Mr. Benton's progress, which it encourages and welcomes. The Court also shares Mr. Benton's concern as to what treatment he may be receiving (or not receiving) while detained. *See* Dkt. No. 25 at 2–3. And the hardship of Mr. Benton's detention on his family weighs heavily on the Court.

But the relevant inquiry here is whether Mr. Benton poses a future harm of danger to the community. *See Salerno*, 481 U.S. at 751 ("Under the [Act] . . . a judicial officer evaluates the likelihood of future dangerousness . . . ."). On the one hand, the Court does not doubt that Mr. Benton is a dedicated father, a hard worker with steady employment, a person with strong continued support from friends and family, and someone who has sought out treatment for his mental health issues.

On the other hand, the Court cannot turn a blind eye to the fact that even with the seeming progress Mr. Benton was making with the benefit of supportive friends, a loving family, stable employment, and therapy, he returned to encouraging racially motivated violence little more than one month ago. Nor is it lost on the Court that Mr. Benton is charged not only with possessing an unregistered firearm but also with possessing a machinegun, a weapon that is intended to inflict mass casualties. At a minimum, his August 2024 messages—praising "saints," encouraging others to become "saints," posting video of weapons use, all in light of his self-conception as a "leader and unifier of white supremacists"—demonstrate that he has significantly more work to do. "Improvement is a process," as Mr. Benton points out (Dkt. No. 19 at 6), but a relapse during that process could have devastating, intolerable, and irreversible consequences for the community.

Mr. Benton's record—including firearm possession, participation in weapons training, and recent encouragement of racially motivated violence—undermines his assertion that he is a changed man and makes his risk of danger to the community too great for the Court to ignore.

*See United States v. Lee*, No. CR23-1694, 2024 WL 233188, at *4 (D. Ariz. Jan. 22, 2024) ("Defendant's recent messages, including on the days leading up to his arrest in the instant offense, undermine Defendant's contention that he no longer subscribes to extremist views."); *United States v. Cole*, 465 F. Supp. 3d 1175, 1178 (W.D. Wash. 2020) ("The defendant is viewed as a risk of danger based on the nature of the instant offense, history of alleged weapon possession, and ties to an extremist organization."); *United States v. White*, No. CR18-71386 et al., 2018 WL 5291989, at *8 (N.D. Cal. Oct. 19, 2018) ("The danger to the community is great due to the fact that Defendant and his co-defendants all used the internet to organize and promote the violent rallies."); *Hir*, 517 F.3d at 1091 ("We conclude that the evidence proffered by the government clearly and convincingly establishes [defendant's] willingness to send money and supplies to his brother, knowing that these materials will be used in support of violent activities . . . .").

Therefore, the Court finds that the nature and seriousness of the danger posed by Mr. Benton's release weighs in favor of detention.

For the reasons explained above, and considering the totality of all the factors, the Court finds that the Government has met its burden of clear and convincing evidence that there is no combination of release conditions that will reasonably assure the safety of any person or the community upon Mr. Benton's release.

### IV. CONCLUSION

Accordingly, Mr. Benton's Motion for Review and Revocation of Detention Order (Dkt. No. 19) is DENIED.

Dated this 9th day of October 2024.

Tana Lin
United States District Judge